# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 74222-1-I |
| | ) | |
| Respondent, | ) | |
| | ) | DIVISION ONE |
| v. | ) | |
| | ) | |
| JOHN CARLO FREE, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: October 2, 2017 |
| | ) | |

MANN, J. — After pleading guilty to two counts of first degree rape of a child, John Free received a Special Sex Offender Sentencing Alternative (SSOSA) that required he undergo sexual deviancy treatment. After Free was terminated from two treatment programs, the trial court revoked Free's SSOSA. Free appeals the revocation and challenges conditions imposed by his treatment providers limiting his access to the internet. Free also argues that the trial court applied the wrong standard of proof in the hearing to revoke the SSOSA.

We affirm.

## FACTS

In August 2009, in a negotiated plea deal, Free pleaded guilty to two counts of first degree rape of a child for crimes he committed against his nephew. The State

agreed to consider recommending a SSOSA depending on the results of a sexual deviancy evaluation.

Free underwent a polygraph and had a sexual deviancy evaluation with William Satoran, a certified sex offender treatment provider (CSOTP). Free admitted that between the ages of 35 and 38, he viewed child pornography 50 to 100 times and masturbated while viewing. Free also admitted that he obtained both still photo and video pornography from the internet, and that he would masturbate while viewing. Overall, Satoran determined Free appeared eligible for a SSOSA "in that he is a manageable danger to be at large providing he is in treatment with a CSOTP." Satoran recommended Free be required to enter, and successfully complete, a three-year specialized sexual deviancy treatment program. Recommended conditions included maintaining full time employment and the requirement to "abide by all rules of his treatment program and probation, as well as any other rules his therapist and probation counselor deem appropriate."

Free was sentenced to 131 months to life in prison, with all but 11 months suspended. The court ordered Free to engage in sex offender treatment with Satoran for three years, required Free to abide by all conditions of treatment, to follow all of Satoran's treatment recommendations, and to comply with all conditions imposed by the Department of Corrections (DOC).

On December 30, 2009, Free signed a DOC Conditions, Requirements, and Instructions document indicating that he understood the conditions of community custody, including that he was to follow Satoran's recommended treatment plan. On February 8, 2010, Free signed a treatment contract with Satoran that provided the rules

of the program along with the warning that any violation was grounds for termination. The contract specifically stated that "[h]onesty is demanded by the Program." The contract also required clients to attend 100 percent of their scheduled therapy sessions, complete all "readings and other assignments within prescribed time limits," and to "participate actively in group therapy." The contract prohibited clients from using "pornography in any form" and from using the internet "unless they have special permission from the CCO [community corrections officer] and treatment provider and are using porn filters."

In May 2010, Free's niece reported that the he had molested her on multiple occasions starting when she was seven or eight years old. Free entered into a negotiated plea of guilty to a reduced charge of felony communication with a minor for immoral purposes and was sentenced to 24 months, with his SSOSA deferred until his release from custody.

Free was released from prison in April 2012 and resumed treatment with Satoran on June 5, 2012. In his March 2013 SSOSA progress report, Satoran noted several issues with Free over the proceeding months, such as accessing the internet contrary to treatment rules, missing sessions, remaining unemployed, and obfuscation. Satoran concluded "Despite the rule violation I am not recommending a SSOSA revocation hearing at this time. However, due to the violation and the missed sessions this following month he bears watching and will need to show significant improvement over the next 3 months." In July 2013, Satoran reported that Free was not complying with his homework assignments or his requirements for his treatment group and that his participation was "not up to group standards."

-3-

On November 22, 2013, Free was suspended from Satoran's treatment program. The DOC filed a notice of violation of Free's SSOSA. When the CCO contacted Satoran, Satoran stated the defendant had been suspended for nonpayment of fees, for not completing the homework, and for not actively participating in group sessions. Free had quit his job, disregarding group advice, saying it was "a minimum wage, bottom of the barrel job." Free was not actively participating in job search activities.

Satoran reinstated Free in December 2013, but the problems continued. Free was not consistent in turning in his weekly impulse charts, mood logs, or weekly checklists. He was still not in in compliance with his homework, remained out of work, and owed $1500 in fees. Satoran suspended Free again on January 7, 2014, and then terminated him from the treatment program on January 27, 2015.

The DOC filed a second violation report specifically noting the termination from Satoran's group and Free's growing hostility with his CCO. The CCO recommended that the court evaluate whether a SSOSA sentence is appropriate for Free. Free was taken into custody pending a revocation hearing.

Free's counsel referred him to Dr. Myrna Pinedo, who reviewed Free's evaluation, progress reports, polygraph, and case file, then interviewed Free before agreeing to allow him to join her treatment program for a 90-day probationary period.

A violation hearing was held and the defendant admitted to violating his SSOSA by failing to make reasonable progress in treatment and being terminated from the required treatment program. Free was granted a 90-day probationary period for reentry into treatment with Dr. Pinedo. Agreed conditions of the probation included: (1) enrolling in Dr. Pinedo's treatment program, (2) complying with all conditions of

treatment and supervision "without complaint, negotiation, or argument," (3) seeking and maintaining employment, (4) completing all homework assignments, and (5) not possessing, using, accessing or viewing any sexually explicit or erotic material. By agreeing to the terms of probation, Free understood:

> that if he does not meet the standards of behavior and participation of Dr. Pinedo's program, has one unexcused absence from a treatment session, misses one payment, does not present homework assignments on the day that they are due, or commits any violation of treatment or supervision, that he will be immediately terminated from treatment, the Court will immediately order a no-bail bench warrant for defendant's arrest, and the State will recommend revocation of his suspended sentence. <u>Defendant further understands and has been given clear and explicit notice from the Court that 100% strict compliance with all conditions noted above is required</u>.

The court ordered Free to serve 60 days in jail and then enter into the 90-day probationary period with Dr. Pinedo. Free was released from confinement in July 2014, and reported to Dr. Pinedo's treatment program. Dr. Pinedo informed Free that her program had stringent requirements that were strictly enforced, and any violation of the rules set by the program or the DOC would result in immediate termination. Dr. Pinedo believed the strict boundaries may make it more likely for Free to be successful in the program. Free agreed to Dr. Pinedo's treatment program rules. In addition to the written treatment program rules, Dr. Pinedo testified at the revocation hearing that none of the men in her program are allowed to use the internet "unless they have written up some boundaries," and that she had informed Free of this restriction. Dr. Pinedo testified that she informed Free that he could access the internet at an agency such as WorkSource for job searches so long as he was monitored.

In August 2014, Free's CCO, Brian Dalton, received a report from the monitoring program on Free's computer, Covenant Eyes, indicating Free may have acted to evade the security levels on his computer. Dalton ordered Free to undergo a polygraph examination, however the test was inconclusive due to Free using "purposeful physical movements in an attempt to influence the results." When confronted Free became agitated, angry, and defensive.

After hearing these reports, Dr. Pinedo terminated Free from her program. Dr. Pinedo's termination report identified four treatment rules that Free violated: (1) failing to comply with all probation orders and treatment directives by attempting to circumvent Covenant Eyes, (2) violating a treatment rule by accessing websites not approved by his CCO or the counselor, (3) failing to disclose completely and honestly his intent to access unapproved websites and by being secretive and uncooperative, and (4) omitting information from his treatment provider. Dr. Pinedo summarized:

> Mr. Free has demonstrated a persistent pattern of deviant thinking, attitudes and behaviors that support potential reoffending. He was given an opportunity by the court to remain in community based treatment after termination from Mr. Satoran's sexual deviancy program. He clearly intended to manipulate and deceive his community corrections officer and this sexual deviancy treatment provider which would indicate no reduction in his potential for reoffending. Therefore, he has been terminated from this sexual deviancy treatment program on the basis that he is considered to be a High Risk for reoffense in the community.

The State petitioned for revocation of Free's SSOSA, asserting the following violations of community custody:

1. Failure to abide by the instruction of the Department of Corrections and Sex Offender and Treatment Program Rules by accessing the internet for non-work related purposes on 8/1/14.
2. Accessing the internet without prior approval from 8/1/14 through 8/6/14.

3. Accessing private search (proxy) websites to circumvent Covenant Eyes between 8/1/14 and 8/10/14.
4. Using intentional movement during a Polygraph Test in an attempt to influence the results on 8/12/14.
5. Failing to comply with sexual deviancy treatment by being terminated by Dr. Pinedo on 8/8/14.

At the revocation hearing, Free informed the court that he could not find a sex offender treatment provider willing to accept him into treatment.

After hearing the evidence and reviewing the record, the trial court determined the State had proved the violations by "substantial evidence" and revoked the SSOSA. The court made the following findings:

1. The defendant failed to make reasonable progress in court ordered sexual deviancy treatment—having been terminated from the treatment program of William Satoran (1/27/14) and Dr. Myrna Pinedo (8/18/14).
2. Failing to abide by DOC and SOTP rules by accessing the Internet on 8/1/14.
3. Accessing the Internet without prior approval from 8/1/14 to 8/8/14.
4. Accessing private search (proxy) websites to circumvent Covenant Eyes.

The court found "that revocation of the suspended sentence is appropriate based upon any one of the violations above, as well as all violations." Free was directed to serve the remainder of his indeterminate sentence of 131 months to life.

## ANALYSIS

*Revocation for Violation of a Condition*

"Under the Sentencing Reform Act of 1981, chapter 9.94A RCW, a first-time sex offender may be eligible for a suspended sentence under the SSOSA provisions." State v. Miller, 180 Wn. App. 413, 417, 325 P.3d 230 (2014); RCW 9.94A.670(2). The

"SSOSA was created because it was believed that for certain first-time sexual offenders, 'requiring participation in rehabilitation programs is likely to prove effective in preventing future criminality.'" Miller, 180 Wn. App. at 417 (quoting State v. Goss, 56 Wn. App. 541, 544, 784 P.2d 194 (1990) (quoting DAVID BOERNER, SENTENCING IN WASHINGTON § 2.5(c) (1985))).

A SSOSA may be revoked at any time during the period of community custody and the sentence reinstated if there is sufficient evidence to convince the trial court that the offender has either "violated a condition of the suspended sentence or failed to make satisfactory progress in treatment." State v. McCormick, 166 Wn.2d 689, 705, 213 P.3d 32 (2009); RCW 9.94A.670(11). "Revocation of a suspended sentence due to violations rests within the discretion of the trial court and will not be disturbed absent an abuse of discretion." McCormick, 166 Wn.2d at 705-06. "An abuse of discretion occurs only when the decision of the court is 'manifestly unreasonable, or exercised on untenable grounds, or for untenable reasons.'" McCormick, 166 Wn.2d at 706 (quoting State ex rel. Carroll v. Junker, 79 Wn.2d 12, 26, 482 P.2d 775 (1971)).

Here, the trial court did not abuse its discretion in revoking the suspended sentence. The trial court listed four independent reasons for suspending the SSOSA, the first being a finding that Free "failed to make reasonable progress in court ordered sexual deviancy treatment—having been terminated from the treatment program of William Satoran . . . and Dr. Myrna Pinedo." The evidence supports this finding.

Free's original judgment and sentence required that he participate in sex offender treatment for three years and that he follow all recommendations of his treatment provider. He subsequently agreed to conditions for his 90-day probationary period that

-8-

also required that he comply with all conditions of treatment and supervision "without complaint, negotiation, or argument." It is undisputed that Free was terminated from treatment by both Satoran and Dr. Pinedo. It is also undisputed that at the time of Free's revocation hearing there were no treatment providers willing to take him. Since a SSOSA may be revoked for any violation of a condition of the suspended sentence or failure to make satisfactory progress in treatment, this finding alone was sufficient for the trial court to revoke Free's suspended sentence.

*Limitation on Access to Internet*

Free's primary arguments on appeal concern the trial court findings for revocation, as they relate to regulations on his use of the internet. Free argues (1) the treatment provider conditions limiting his access to the internet were not authorized by statute because they were not crime related, (2) the DOC condition limiting his internet access was not in writing, and (3) conditions limiting access to the internet violate Free's First Amendment rights.

Free argues that the reason he was terminated from treatment was impermissible as it was primarily because of his violation of the treatment providers' internet restrictions. We disagree.

At the outset, we note there is currently no Washington case law or statute that restricts a treatment provider's ability to regulate a participant's use of the internet. In State v. O'Cain, this court reversed an internet restriction set by the trial court for not being "crime-related;" although we specifically clarified that the decision "does not preclude control over internet access being imposed as part of sex offender treatment if recommended after a sexual deviancy evaluation." 144 Wn. App. 772, 775, 184 P.3d

-9-

1262 (2008). However, we do not explore this issue further. In this case, while both treatment providers imposed limitations on Free's internet access, and both faulted him for violating those limitations, their primary reasons for terminating Free were based on his failure to participate in the program and his continued dishonesty.

Free's SSOSA required that he engage in sex offender treatment with Satoran for three years and that he abide by all conditions of treatment and follow all of Satoran's treatment recommendations. Free signed a treatment contract with Satoran that required honesty, required he participate fully in treatment, and required that he not access the internet without permission. Satoran terminated Free for nonpayment, for failing to complete his homework, failing to actively participate, and for exhibiting a poor attitude toward treatment. After hearing testimony from Satoran, the trial court agreed: "I think any way you look at it from Mr. Satoran's testimony and the documents that he's filed in this case, Mr. Free did not make satisfactory progress in treatment."

Despite his termination from Satoran's treatment program, Free was given a second chance to reenter treatment with Dr. Pinedo. As a condition of a 90-day probationary period, Free agreed to enroll with Dr. Pinedo, and comply with all treatment conditions without complaint, negotiation, or argument. Dr. Pinedo's conditions included the requirement for complete and honest disclosure.

When Dr. Pinedo terminated Free from her program, she did consider his unauthorized use of the internet, however, only because this use of the internet was indicative to his lack of commitment and honesty. Dr. Pinedo found Free's attempts to circumvent internet safety controls constituted a failure to completely and honestly participate in the program. Dr. Pinedo concluded that Free "has demonstrated a

-10-

persistent pattern of deviant thinking, attitudes and behaviors that support potential reoffending." After hearing testimony and reviewing documents, the trial court agreed:

> One of the core principles, what's necessary to be successful and make reasonable progress in a SSOSA is to be honest, honest with your CCO and honest with your treatment provider, and that was clearly not the case with Mr. Free. And so I don't find that he made reasonable progress in treatment with Dr. Pinedo as well, and that's supported by substantial evidence.[1]

Thus, we hold the trial court did not abuse its discretion in revoking Free's suspended sentence based on his failure to make progress in treatment.

We need not address the subsequent claims challenging the remaining findings. We draw a direct analogy to a court's imposition of an exceptional sentence on multiple grounds. In that circumstance, "an exceptional sentence may be upheld on appeal even where all but one of the trial court's reasons for the sentence have been overturned." State v. Gaines, 122 Wn.2d 502, 512, 859 P.2d 36 (1993). Remand is only necessary "where it is not clear whether the trial court would have imposed an exceptional sentence on the basis of only the one factor upheld." Gaines, 122 Wn.2d at 512; See also State v. Parker, 132 Wn.2d 182, 189, 937 P.2d 575 (1997). In this case, the trial court left no ambiguity in specifically finding "revocation of the suspended sentence is appropriate based upon any one of the violations above."

*Standard of Proof for Revocation*

Free next argues that the trial court applied the incorrect evidentiary standard of proof in determining whether to revoke Free's SSOSA, violating his right to due process. We disagree.

---

[1] Report of Proceedings (RP) (Oct. 31, 2014) at 339.

"The revocation of a suspended sentence is not a criminal proceeding, but rather an extension of the original criminal conviction." McCormick, 166 Wn.2d at 699. "An offender facing a revocation of a suspended sentence has only minimal due process rights because the trial has already occurred and the offender was found guilty beyond a reasonable doubt." McCormick, 166 Wn.2d at 700 (citing State v. Dahl, 139 Wn.2d 678, 683, 990 P.2d 396 (1999)).[2]

A SSOSA may be revoked at any time during the period of community custody if there is sufficient proof to reasonably satisfy the court that the offender (1) has violated a condition of the suspended sentence or (2) is failing to make satisfactory progress in treatment. McCormick, 166 Wn.2d at 705 (emphasis added).

At trial, the State argued, "ultimately, the court is only being asked to find whether there is substantial evidence to prove the violation certainly on a much lesser standard than proof beyond a reasonable doubt." The trial court then stated it was applying the "substantial evidence" standard in making its rulings. Free is correct that "substantial evidence" is the appellate standard of review. However, a finding by the trial court that "substantial evidence" supports each violation, though not the exact language of the standard, adequately demonstrates that the trial court found "sufficient proof to reasonably satisfy the court." Thus, we find that any error in the use of this language was harmless.

Free next argues that the trial court should have applied the "preponderance of the evidence" standard in determining whether the SSOSA should be revoked. Free

---

[2] "The Supreme Court has extended some due process protections when probation is revoked for the failure to pay fines or fees." McCormick, 166 Wn.2d at 700.

argues that the U.S. Supreme Court decision Morrissey v. Brewer, 408 U.S. 471, 484, 92 S. Ct. 2593, 33 L. Ed. 2d 484 (1972), and this court's decision In re Pers. Restraint of McKay, 127 Wn. App. 165, 169, 110 P.3d 856 (2005), require this heightened evidentiary standard. We disagree.

The Washington Supreme Court addressed the added due process requirements as proscribed by Morrissey in State v. Dahl, 139 Wn.2d 678, 990 P.2d 396 (1999), where the court added several minimal requirements in order to satisfy due process.[3] "These requirements exist to ensure that the finding of a violation of a term of a suspended sentence will be based upon verified facts." Dahl, 139 Wn.2d at 683 (citing Morrissey, 408 U.S. at 484); See also McCormick, 166 Wn.2d at 700. Since then, our Supreme Court has declined to reconsider the "sufficient proof to reasonably satisfy the court" evidence requirement. See McCormick, 166 Wn.2d 689 (holding "a SSOSA sentence may be revoked at any time if there is sufficient proof to reasonably satisfy the court."); See also Dahl, 139 Wn.2d at 705 (holding "an offender's SSOSA may be revoked at any time if a court is reasonably satisfied.").

Free invites this court to presume that those decisions "accidentally" relied on the same evidence requirement. We decline their invitation. We are bound by the decisions of our Supreme Court, and "overruling a prior decision . . . is not a step that should be taken lightly." Keene v. Edie, 131 Wn.2d 822, 831, 935 P.2d 588 (1997). We

---

[3] In Dahl, the Washington Supreme Court incorporated the United States Supreme Court's holding that minimal due process entails:

> (a) written notice of the claimed violations; (b) disclosure to the parolee of the evidence against him; (c) the opportunity to be heard; (d) the right to confront and cross-examine witnesses (unless there is good cause for not allowing confrontation); (e) a neutral and detached hearing body; and (f) a statement by the court as to the evidence relied upon and the reasons for revocation.

Dahl, 139 Wn.2d at 683; McCormick, 166 Wn.2d at 700.

will not abandon an established rule absent a showing that the rule is "incorrect and harmful." In re Stranger Creek and Tributaries in Stevens County, 77 Wn.2d 649, 653, 466 P.2d 508 (1970). Free has failed to meet that burden.

*Statement of Additional Grounds*

In his statement of additional grounds, Free argues that the trial court erred in admitting several exhibits including: (1) the Covenant Eyes report, (2) Dalton's DOC chronological event notes that pertain to his conversations with Free, and (3) the printouts of the proxy server webpages. Free argues that the Covenant Eyes report was hearsay and violated his right to confront the witness, as the person who created the report was not present to testify at trial. He also argues that Dalton's report containing his chronological events could have been doctored, noting the rule of completeness, and should not have been admitted. Finally, Free argues that the proxy server printouts should not have been admitted because they mischaracterized the evidence.

Hearsay evidence is admissible at revocation hearings if good cause outweighs the defendant's right to confront and to cross-examine witnesses. State v. Nelson, 103 Wn.2d 760, 765, 697 P.2d 579 (1985). "The minimal due process right to confront and cross-examine witnesses is not absolute. Courts have limited the right to confrontation afforded during revocation proceedings by admitting substitutes for live testimony, such as reports, affidavits and documentary evidence." Dahl, 139 Wn.2d at 686. "Hearsay evidence should be considered only if there is good cause to forgo live testimony." Dahl, 139 Wn.2d at 686; Nelson, 103 Wn.2d at 765. Good cause exists when procuring the witness would be difficult and expensive and the State can show that the proffered

-14-

evidence was demonstrably reliable or clearly reliable. See Dahl, 139 Wn.2d at 686 (quoting Nelson, 103 Wn.2d at 765). "Unreliable hearsay may not be the sole basis for revocation of probation." Nelson, 103 Wn.2d at 765.

In this case, we hold good cause outweighs Free's right to confront the creator of the report. Covenant Eyes is a commonly used monitoring system for the DOC. The State adequately showed the Covenant Eyes report was reliable by having Dalton testify to his experience with their accuracy and how commonly they are used. Expecting the DOC to procure the specific person who created the report for Covenant Eyes would be unnecessarily difficult and expensive.

We also hold good cause existed to allow Dalton to reference his probationary notes taken during the time he worked with Free. Other courts have found "evidence from the court files and state probation reports" though hearsay, were "'reliable and obviously sufficient to satisfy the court that appellant had violated the terms of his probation.'" Nelson, 103 Wn.2d at 764-65 (quoting United States v. Miller, 514 F.2d 41 (9th Cir. 1975)). As the Washington Supreme Court clarified,

> where it not only appears that the reports of program staff therapists contain factual assertions about defendant's use of the program solely to avoid prison and his failure to expend sufficient time and energy to succeed in the program, but also that these assertions are corroborated by the statements of probationer and other witnesses, such hearsay report evidence is demonstrably reliable.

Nelson, 103 Wn.2d at 765. Such is the case here. Although Dalton was present to testify to his conversations with Free and Dr. Pinedo, the evidence provided additional clarification as to the times and dates of the conversations, information that was corroborated by the witnesses. Regarding Free's argument that the evidence should

not be admitted under "the rule of completeness," that objection was not made at the trial court, and we do not consider it here.

Finally, Free argues he was owed both a preliminary hearing and a revocation hearing in order to comply with the requirements set by Morrissey. As previously discussed, this court has already addressed the due process requirements as proscribed by Morrissey. Morrissey requires,

> written notice of the claimed violations of parole, disclosure to the parolee of evidence against him, an opportunity to be heard in person and to present witnesses and documentary evidence, the right to confront and cross-examine adverse witnesses, a neutral and detached hearing body, and a written statement by the fact finders as to the evidence relied on and the reasons for revoking parole.

In re Lain, 179 Wn.2d 1, 18, 315 P.3d 455 (2013) (citing Morrissey, 408 U.S. at 489).

Free's only remaining argument is that the trial court's ruling was based entirely on "unreliable hearsay." Here, the trial court heard several witnesses, including Free's CCO and both of Free's treatment providers, Satoran and Dr. Pinedo. Free's argument is essentially that Dalton "misrepresented" the facts, i.e., the use of the proxy server printouts, and that the allegations were "unsubstantiated." However, Free was given the opportunity to cross-examine these witnesses and present his own defense. "We will not substitute our judgment for the trial court's, weigh the evidence, or adjudge witness credibility." Greene v. Greene, 97 Wn. App. 708, 714, 986 P.2d 144 (1999).

-16-

No. 74222-1-I/17

We affirm.

Cox, J.

WE CONCUR:

FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON

2017 OCT -2  AM 9:07

-17-